MELVIN M.,                                    )
                                              )
                    Plaintiff,                )
                                              )
        v.                                    )       No.  4:17 CV 2725 JMB
                                              )
NANCY A. BERRYHILL,                           )
Deputy Commissioner of Operations,            )
Social Security Administration,               )
                                              )
                    Defendant.                )

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act").  The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff Melvin M.'s ("Plaintiff") application for supplemental security income under Title XVI, see 42 U.S.C. §§ 1381 et seq.[1]  All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  Substantial evidence supports the Commissioner's decision, and therefore it is affirmed.  See 42 U.S.C. § 405(g).

## I.   Procedural History & Summary of Memorandum Decision

On June 27, 2014, Plaintiff filed an application for disability benefits, arguing that his

---

[1] Plaintiff unsuccessfully sought disability benefits on a prior occasion.  See McKinney v. Colvin, 4:12 CV 546 TCM.  On November 19, 2009, he filed an application for alleged disabilities beginning on September 1, 2006.  In the 2009 case, an ALJ found Plaintiff's hepatitis C to be a severe impairment.  (Tr. 59)  An ALJ denied Plaintiff's prior application for disability insurance benefits on January 11, 2010.  (Tr. 70)  In the present case, the ALJ considered whether Plaintiff was disabled as of June 27, 2014.   (Tr. 14)

disability began on June 27, 2014,[2] as a result of hepatitis C, lower back issues and arthritis, arthritis in the hip, right foot, neck, mild disc degenerative disease C4 and C5, depression, stress, right leg damage, arthritis in the pelvis, pain in right elbow, long term and short term memory loss.[3] (Tr. 85, 139-44, 158) On November 4, 2014, Plaintiff's claims were denied upon initial consideration. (Tr. 85-89) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at the hearing (with counsel) on July 26, 2016, and testified concerning the nature of his disability, his functional limitations, and his past work. (Tr. 345-68) The ALJ also heard testimony from Dolores Gonzales, a vocational expert ("VE"). (Tr. 47-52, 225-28) The VE opined as to Plaintiff's ability to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education. (Id.) After taking Plaintiff's testimony, considering the VE's testimony, and reviewing the rest of the evidence of record, the ALJ issued a decision on September 26, 2016, finding that Plaintiff was not disabled, and therefore denying benefits. (Tr. 10-22)

[2] Plaintiff initially alleged an onset date of December 1, 2008. Plaintiff's attorney filed a written motion to amend the onset date to the application date of June 27, 2014, and the ALJ granted the motion. (Tr. 153)

[3] Notably, Plaintiff did not list fecal and urinary incontinence as disabling impairments in his application or in his request for reconsideration. Failure to allege a disabling impairment in an application for disability benefits is a significant factor in determining the severity of an alleged impairment. See e.g., Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (holding fact that claimant did not allege disabling condition in his application significant, even if evidence of the impairment is later developed). However, Plaintiff offered fecal and urinary incontinence as a basis for disability at his administrative hearing. See, e.g., Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994) (finding it "noteworthy that [the claimant] did not allege a disabling mental impairment in her application for disability benefits, nor did she offer such an impairment as a basis for disability at her hearing.") (internal citation omitted)). Although the medical record indicates that Plaintiff has the diagnosis of fecal and urinary incontinence, disability is not determined merely by the presence of an impairment but by the effect that impairment has upon the individual's ability to perform substantial gainful activity. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991). The evidence that his incontinence impaired Plaintiff's ability to perform basic work activities is Plaintiff's hearing testimony and the four third-party statements.

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration ("SSA"). (Tr. 1-5) On September 26, 2017, the Appeals Council denied review of Plaintiff's claims, making the September 26, 2016, decision of the ALJ the final decision of the Commissioner. Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court. See 42 U.S.C. § 405(g).

In his brief to this Court, Plaintiff raises two related issues. First, he argues that the ALJ's Residual Function Capacity ("RFC") determination is not supported by substantial evidence. Second, he argues that the ALJ failed to properly consider third-party evidence and Plaintiff's hearing testimony. The Commissioner filed a detailed brief in opposition.

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.    __Third Party Statements__ (Tr. 167-74, 230-31)

The administrative record before this Court includes two third-party letters, one from Jarrett McKinney, Plaintiff's son, and one from Rochelle Dixon, Plaintiff's friend, both dated July 25, 2016, and a Function Report Adult – Third Party completed by Rosella McKinney, his aunt. (Tr. 167-74, 230-31) There is also a Function Report – Adult completed by Kimberly Byrd, a family friend, with Plaintiff providing the answers to the questions.[4] (Tr. 187-94)

Mr. McKinney stated that he takes care of his father daily, and his duties include assisting with meal preparation, cleaning dishes, taking out the trash, doing laundry, changing bed linens, and medication reminders. (Tr. 230) Ms. Dixon provided "an overview of how [she has]

---

[4] As noted by Defendant, Ms. Byrd assisted Plaintiff in completing the Function Report – Adult so the information contained therein reflects Plaintiff's own subjective reports of his limitations. Indeed, Ms. Byrd stated that "[i]t took me a [week] to get him to help me fill these forms out." (Tr. 197) Ms. Byrd explained that she filled out the form on behalf of Plaintiff "because he doesn't understand how to fill these forms out." (Id.)

watched the decline of once a healthy man to a person who can barely do the basic functions of life." (Tr. 231) Ms. Dixon further stated that she witnessed Plaintiff soil himself as well as having frequent incontinence. Ms. Dixon's letter discusses Plaintiff's financial and personal hardships. (Tr. 231)

Ms. McKinney completed a Function Report Adult – Third Party on October 13, 2014. (Tr. 167) Ms. McKinney indicated that Plaintiff does not need reminders to take his medicine, and he can go out alone and drive a car. (Tr. 169-70) Ms. McKinney listed reading and watching television at Plaintiff's hobbies. (Tr. 171) Ms. McKinney indicated that Plaintiff has no problem handling stress or changes in his routine, and he wears a brace/splint not prescribed by a doctor. (Tr. 173) Ms. McKinney indicated that Plaintiff has problems with bowel movements and stays in the bathroom for long periods of time. (Tr. 168)

In his Function Report – Adult, completed on October 25, 2014 with the assistance of Ms. Byrd, Plaintiff asserted that his impairments limit his abilities to stand, walk, sit, lift, squat, reach, bend, kneel, climb stairs, and hear and affect his memory and concentration, and his ability to complete tasks, concentrate, and follow instructions. Plaintiff stated that he uses the bathroom with great frequency and has frequent accidents. Plaintiff reported that he needs assistance caring for his children because he cannot do anything. Plaintiff reported that he could prepare simple meals and heat food in the microwave. Plaintiff indicated that he could leave the house alone but he does not. Plaintiff does not drive because of his medications.

### III. **Medical Records**

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from July 17, 2013, through June 7, 2016. The Court has reviewed the entire record. The following is a summary of pertinent portions of the medical records

relevant to the matters at issue in this case.

A.    **Barnes Jewish Hospital** (Tr. 253-91, 352-495, 497-739)

Between July 17, 2013, and June 7, 2016, a number of doctors on staff in the emergency room at Barnes Jewish Hospital and on the staff at the Medicine Clinic at Barnes Jewish Hospital treated Plaintiff.

On July 17, 2013, Plaintiff received treatment in the emergency room. Plaintiff reported having left heel numbness and a recent Achilles tendon injury. Depression and hepatitis C are listed as his medical history. Musculoskeletal examination showed a normal range of motion with no tenderness.

Plaintiff presented as a new patient and for follow-up emergency department treatment with Dr. Seth Bloom. Plaintiff's medical history included depression, chronic abdominal pain, and urinary incontinence. Plaintiff reported working on receiving disability benefits due to his psychological issues. On September 27, 2013, Dr. Bloom's examination showed Plaintiff to be in no acute distress and his musculoskeletal strength normal. Dr. Bloom found Plaintiff had normal affect and mood and oriented x3. Plaintiff reported having chronic neck pain and not seeing his psychiatrist recently but he had an appointment scheduled in the following few months. Plaintiff indicated that he was currently unemployed and lived with his father and two children. Examination showed Plaintiff had 5/5 strength and a normal range of motion.

In follow-up treatment on December 23, 2013, Plaintiff reported having low back pain and no increase or worsening symptoms of his urinary incontinence. Plaintiff noted that he not see his psychiatrist recently but had an appointment scheduled. Examination showed Plaintiff had normal range of motion of his neck and upper extremities and 5/5 strength. Dr. Bloom noted that Plaintiff's mood was stable. Plaintiff returned on May 20, 2014, for evaluation of his back

pain. Plaintiff reported continued right sided upper back and lower back pain but he experience relief within ten minutes of taking ibuprofen. Plaintiff reported urinating on himself four days earlier but not remembering a prior event of incontinence. Dr. Bloom found Plaintiff's neck and back to be neurologically intact on examination. Plaintiff reported his fecal incontinence being persistent but only occurring occasionally when urinating.

In follow-up treatment on August 25, 2014, Plaintiff reported urinary incontinence occurring a few times a month and fecal incontinence occurring during urination. Dr. Bloom found Plaintiff's neck and back to be neurologically intact on examination. On October 3, 2014, Plaintiff reported having urinary accidents three to four times a week. Dr. Bloom noted that Plaintiff "is somewhat a poor historian and seems somewhat unsure about many of his answers." (Tr. 253)

Plaintiff presented in the emergency room at Barnes Jewish Hospital on November 9, 2014, complaining of lower back pain for a month. Plaintiff reported that his lower back pain was usually controlled with his baseline medication, ibuprofen, but he ran out of his prescription ibuprofen so he was seeking a refill. Psychiatric examination showed Plaintiff had normal affect and mood and behavior were appropriate. After reviewing his medical clinic records, the treating doctor noted that Plaintiff's incontinence was stable. The doctor ordered a refill of Plaintiff's ibuprofen and hydrocodone prescriptions.

Plaintiff returned on November 14, 2014, and reported recently running out of ibuprofen causing increased chronic back pain. An x-ray of Plaintiff's lumbar spine revealed mild degenerative disk disease. Dr. Jonathon Baker noted that Plaintiff's fecal incontinence was stable and only occasionally occurred when urinating.

On November 21, 2014, Dr. Tammy Ho treated Plaintiff's urinary incontinence. Plaintiff

reported that he did not wear pads and that he experienced incontinent episodes every couple of days. Psychiatric examination showed Plaintiff had normal affect and mood and oriented x3. Dr. Ho noted that Plaintiff's voiding diary[5] showed infrequent voids and some bowel incontinence. Dr. Ho found that Plaintiff had lower urinary tract symptoms ("LUTS") with occasional urge incontinence and recommended time voiding every four hours.

A February 9, 2015, MRI of Plaintiff's lumbar spine showed normal alignment and lumbar spondylosis at L4-L5 and L5-S1 with a right paracentral disk protrusion at L4-L5 abutting and descending right L5 nerve root. In routine follow-up on February 23, 2015, Plaintiff reported having a stressful week because his cousin was murdered but he was otherwise not actively depressed. Dr. Bloom noted that the recent MRI showed some disk protrusion and nerve root displacement probably accounting for some but not all of Plaintiff's symptoms. Dr. Bloom also noted that Plaintiff's mood was stable.

Plaintiff presented in the emergency room at Barnes Jewish Hospital on March 8, 2015, complaining of right eye pain. Examination showed a superficial corneal abrasion. On May 1, 2015, Plaintiff presented in the emergency room complaining of increasing headache with no relief from ibuprofen.

On May 22, 2015, Plaintiff returned for six month follow-up and medication review. Plaintiff reported no incontinence episodes but still experienced urgency. Plaintiff indicated that his medication regimen was working. Dr. John Brockman noted Plaintiff's affect was flat, normal mood, and he was oriented x3. Plaintiff presented in the emergency room on May 28,

---

[5] The record contains a voiding diary that Plaintiff kept, recording the times that he had to use the bathroom each day. (Tr. 465-73) The diary includes entries spanning from October 3, 2014, to November 21, 2014. According to his diary entries, Plaintiff went to the restroom anywhere from two to seven times a day, depending on the day. The majority of the days in Plaintiff's diary indicate that he went to the bathroom from five to six times in a twenty-four hour time span.

2015, complaining of lower back pain flaring up without any relief from ibuprofen and requesting pain medication.  Plaintiff was discharged from the emergency room with crutches.

Plaintiff returned on June 1, 2015, as follow-up from emergency room treatment for low blood pressure and reported some improvement with medications.  Plaintiff reported rare urinary and fetal incontinence on his medication regimen.  Dr. Bloom noted that Plaintiff's MRI showed some disk protrusion and right L5 nerve root displacement which accounted for some but not all of his back pain symptoms.  Dr. Bloom found Plaintiff's mood to be stable and although he had a lot of external stressors, Plaintiff did not seem depressed.  As to his functional capacity, Plaintiff reported not having difficulty walking, getting dressed, bathing/grooming, with his memory, and with activities of daily living including cooking, cleaning, shopping, and driving.

During treatment on July 16, 2015, Plaintiff reported occasional low back pain and rare urinary and fecal incontinence.  Dr. Nhila Jagadeesan, his new primary care physician, found Plaintiff's fecal incontinence to be stable.  Although Plaintiff reported a lot of stressors, Dr. Jagadeesan found his mood to be stable and he did not appear to be depressed.  On July 17, 2015, Ashwin Kamath, a neurosurgeon, evaluated Plaintiff for lumbar spondylosis.  Dr. Kamath observed that Plaintiff ambulated without difficulty.  Plaintiff reported a chronic urinary and fecal incontinence for twenty plus years and denied any recent changes in his back pain or bowel or bladder incontinence.  Examination showed Plaintiff to be alert and oriented x3 and good movement of all extremities, with 5/5 strength and normal gait.  Dr. Kamath found Plaintiff would likely not benefit from any surgical intervention on his spine.  Dr. Kamath noted that Plaintiff had not tried physical therapy and noted that he would provide a referral to help Plaintiff's back pain.

In follow-up treatment on October 15, 2015, Dr. Karen Winters adjusted Plaintiff's

medication regimen by adding Naprosyn and noted that Plaintiff arrived ambulating with a steady gait and required no assistance. Plaintiff reported experiencing chronic pain in his lower back. Plaintiff returned on December 15, 2015, for a routine visit and reported no lower back pain but only neck pain. Plaintiff reported improvement in his back pain after the medication adjustment and requested a prescription for diapers for his fecal incontinence.

During treatment on April 13, 2016, Dr. Jagadeesan observed Plaintiff arrived ambulating with a steady gait and required no assistance. Plaintiff reported not experiencing any pain on that day. Dr. Jagadeesan noted that the medications for Plaintiff's urinary continence had been discontinued most likely because Plaintiff had not returned for treatment for a year but he had a pending urology appointment in May.

On May 27, 2016, Plaintiff presented for yearly follow-up treatment for LUTS, chronic urinary and intermittent fecal incontinence. Plaintiff reported not wearing pads and having occasional incontinence. Plaintiff reported that he experienced feelings of incomplete emptying, urgency, frequency, and occasional urge incontinence. Plaintiff denied other complaints and stated that his voiding symptoms were the same.

On June 7, 2016, Plaintiff reported right knee, calf, and ankle pain and right knee instability. Examination showed increased Achilles tendon thickness and stiffness. Dr. Winters found Plaintiff's right ankle pain likely due to chronic Achilles tendinopathy after acute injury. A right ankle radiography showed no acute fracture and Plaintiff's Achilles tendon was mildly thickened.

### B. **Hopewell Center** (Tr. 293-314, 316-341)

Between August 22, 2013 and May 20, 2016, Plaintiff received treatment, in the form of fifteen minute counseling sessions and medication management, for his major depressive

disorder at the Hopewell Center.[6]

In the August 22, 2013, Physician Progress Note, Dr. Parwatfarm noted Plaintiff had multiple physical and legal problems and prescribed medications as treatment. Plaintiff returned on November 21, 2013, for medication administration and Dr. Parwatfarm noted the severity of Plaintiff's depression was moderate and his symptoms were stable. Dr. Parwatfarm found Plaintiff's behavior to be appropriate, his thought associations intact, his mood and affect appropriate, his concentration normal, and that Plaintiff was oriented to time, person, place, and situation. Dr. Parwatfarm continued this medication regimen.

In follow-up treatment on February 13, 2014, Plaintiff reported having financial problems and applying for disability. Dr. Parwatfarm noted that Plaintiff's mood was stable and his was concentration poor. Dr. Parwatfarm found his depression and anxiety to be improving and made no changes to his medication regimen. Plaintiff returned on April 28, 2014, and Dr. Parwatfarm noted his depression was improving and he was oriented to time, person, and place. In an Individual Service Progress Note, a nurse practitioner noted that Plaintiff had been noncompliant with his medications. During treatment on July 21, 2014, Dr. Parwatfarm noted that Plaintiff had social and legal problems, and found his depression and anxiety to be improving and continued his medication regimen.

In follow-up treatment on October 21, 2014, Plaintiff reported his aunt's death. Dr. Parwatfarm found improvement in Plaintiff's depression and anxiety and continued his medication regimen. Plaintiff returned on January 13, 2015, and reported his father was having chemotherapy. On April 7, 2015, Dr. Parwatfarm found improvement in Plaintiff's depression

---

[6] The records from Hopewell Center primarily consist of brief summaries of counseling sessions, in which Plaintiff's doctors completed checked box progress notes and reviewed compliance, diagnosis, prognosis, medications, management of side effects, and risks/benefits of treatment options.

and anxiety and continued Plaintiff's medication regimen. During treatment on July 28, 2015, Plaintiff reported a couple of deaths in his family and that his father started radiation. Dr. Parwatfarm found improvement in Plaintiff's depression and anxiety and continued Plaintiff's medication regimen.

During treatment on October 20, 2015, Dr. Parwatfarm found Plaintiff's mood to be "okay," his judgment and memory to be good and continued his medication regimen. In follow-up treatment on March 3, 2016, Plaintiff complained about being out of medications for a month. Dr. Parwatfarm restarted Plaintiff's medication regimen. On March 25, 2016, Plaintiff reported restarting his medications and feeling good. Dr. Parwatfarm found improvement in Plaintiff's depression and continued Plaintiff's medication regimen. During treatment on May 20, 2016, Plaintiff reported feeling okay. Dr. Parwatfarm found Plaintiff's depression to be stable and continued Plaintiff's medication regimen.

### C. **Missouri Baptist Medical Center** (Tr. 344-51)

On February 16 and May 16, 2016, Plaintiff received treatment, pelvic floor therapy, at Missouri Baptist Medical Center for his fecal incontinence.

### D. **St. Alexius Hospital** (Tr. 235-51)

On June 1, 2014, Plaintiff received treatment in the emergency room at St. Alexius Hospital after injuring his back lifting a barbeque grill.

## IV. **The Hearing Before the ALJ**

The ALJ conducted a hearing on July 26, 2016. Plaintiff was present with an attorney and testified at the hearing. The VE also testified at the hearing. (Tr. 345-74)

### A. **Plaintiff's Testimony**

Plaintiff began his testimony by noting that he lives with his father, two brothers, and his

son.  (Tr. 35)  Plaintiff finished ninth grade.  Plaintiff testified that he last worked in 2008 as a driver transporting railroad workers.  (Tr. 36)  Plaintiff stated that he has been disabled since June 2014 because of arthritis in his lower back, neck, and foot, mild degenerative disk disease, enlarged prostate, bulging disk, and incontinence.  (Id.)

Plaintiff testified that his arthritis and back conditions prevent him from bending over and require him to change positions when sitting.  (Tr. 37)  Plaintiff testified that he could stand for ten to fifteen minutes but he would have to shift from leg-to-leg.  His disk disease in his neck causes Plaintiff pain once to twice a day and sometimes all day.  (Tr. 38)  Plaintiff has problems turning his head to the right.  (Tr. 39)  Plaintiff testified that when he stands up, he becomes lightheaded and experiences dizziness.  Plaintiff's incontinence causes him to have a fecal accident once or twice a week, every three weeks, and a urinary accident three times a month and sometimes more.  (Tr. 40-41)  Plaintiff testified that his stress causes him to have crying spells five to six times a month.  (Tr. 41)  Plaintiff explained after he damaged his Achilles tendon, he never fully recovered and he experiences pain in his leg and his pain is alleviated by elevating his leg.  (Tr. 42-43)

Plaintiff testified that on a typical day, he spends time watching television and napping. (Tr. 43)  Plaintiff's lack of sleep diminishes his energy and strength.  (Tr. 45)  His son, a home health care provider, does most of the household chores for him such as preparing his meals.  His son is paid by Medicaid.  Plaintiff testified he cannot drive a car.  Plaintiff does not do any household chores or grocery shopping and has not outside activities.  (Tr. 44)

### B.     The VE's Testimony

The ALJ asked the VE a series of hypothetical questions to determine whether someone Plaintiff's age, education, work experience, and specific functional limitations would be able to

find a job in the local or national economy. (Tr. 49) The VE responded that such a hypothetical person would be able to perform the light job duties of a hand packager, a lab equipment cleaner, and an order picker. (Tr. 50) The ALJ next asked whether reducing the exertional level to light with the ability to lift, carry, or push 20 pounds occasionally and 10 pounds frequently would preclude employment. The VE indicated that such hypothetical person would be able to perform the light job duties of a router, a mail sorter, and a housekeeper. Next, the ALJ asked whether reducing the exertional level to sedentary with the ability to lift, carry, push or pull ten pounds occasionally, less than ten pounds frequently and stand or walk for two hours total in an eight-hour workday would preclude employment. The VE indicated that such hypothetical person would be able to perform the job duties of an addresser, a document preparer, and a press clipping cutter, paster. (Tr. 51) Last, the ALJ asked whether a need to take unscheduled breaks at will would preclude employment. The VE indicated that such individual would not be able to maintain employment. (Tr. 51)

## V.   The ALJ's Decision

In a decision dated September 27, 2016, the ALJ determined that Plaintiff was not disabled under the Social Security Act. (Tr. 13-22) The ALJ determined that Plaintiff had severe impairments of degenerative disk disease, a major depressive disorder, and incontinence. (Tr. 15-17) The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform a range of light work with the following modifications: he can lift, carry, push, or pull 20 pounds occasionally and ten pounds frequently; he could sit for 6 hours in an 8-hour workday; he could stand or walk for 6 hours in an 8-hour workday; he could occasionally climb ropes, ladders, scaffolds, ramps, and stairs; he could occasionally balance, stoop, kneel, crouch, and crawl; he is able to understand, remember, and carry out at least simple and routine tasks; and he

13

must have regular access to a restroom at the job site.  (Tr. 17)

The ALJ concluded that Plaintiff could not return to his past relevant work as a mail clerk or food service agent/caterer.  (Tr. 20)  Based on hypothetical questions posed to the VE, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act because someone with his age, education and functional limitations could perform other work that existed in substantial numbers in the national economy.  (Tr. 21)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

## VI.   Standard of Review and Legal Framework

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …."  Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [her] previous work but cannot, considering [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled….  The ALJ consider[s] whether:  (1) the claimant was employed; (2) [he] was severely impaired; (3)

[his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VII.   Analysis of Issue Presented

In his brief to this Court, Plaintiff challenges the ALJ's RFC determination generally as not being supported by substantial evidence, and the ALJ's failure to properly consider third party evidence and Plaintiff's hearing testimony.

### A.        Residual Functional Capacity

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence by the ALJ's failure to consider the evidence regarding his incontinence and supporting the RFC findings with medical evidence.

A claimant's RFC is the most an individual can do despite the combined effects of his credible limitations. See 20 C.F.R. § 404.1545. "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)). An ALJ's RFC finding is based on all of the record evidence, the

claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence.  See Wildman, 596 F.3d at 969; see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment.").  The ALJ must explain her assessment of the RFC with specific references to the record.  SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion).  Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant.  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).  Disability is not determined by the presence of impairments, but by the effect the impairments have on the individual's ability to perform substantial gainful activity.  The "mere existence" of an impairment is insufficient to prove disability; there must also be "proof of the impairment's disabling severity."  Rhodes v. Schweiker,  660 F.2d 722, 723 (9th Cir. 1981) (citation omitted).

Based on the objective medical evidence and Plaintiff's testimony and after evaluating Plaintiff's subjective symptoms, the ALJ determined that Plaintiff retained the RFC to perform a range of light work[7] with the following additional limitations/restrictions:  (1) Plaintiff can lift, carry, push, or pull 20 pounds occasionally and10 pounds frequently; (2) Plaintiff can sit for 6 hours in an 8-hour workday; (3) Plaintiff can stand or walk for 6 hours in an 8-hour workday; (4) Plaintiff can occasionally climb ropes, ladders, scaffolds, ramps, and stairs; (5) Plaintiff can

---

[7] "According to the regulations, 'light work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects."  Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing 20 C.F.R. § 404.1567(b)).

occasionally balance, stoop, kneel, crouch, and crawl; (6) Plaintiff can understand, remember, and carry out at least simple and routine tasks; and (7) Plaintiff must have regular access to a restroom at the job site.

Plaintiff argues that the ALJ erred to account for his incontinence precluding his ability to perform basic work functions because this condition would require him to work in close proximity to bathroom facilities and to take work breaks at will to urinate.[8]  At the hearing, Plaintiff testified that he has fecal incontinence once or twice a week or every three weeks, and he has to sit down when urinating because of his fecal incontinence.  Plaintiff testified that he experiences urinary incontinence at least three times a month and sometimes more.  Plaintiff indicated that he has to stay at home to have access to a bathroom.

The medical record is not silent as to his incontinence.  The ALJ cited to evidence in the record to contradict Plaintiff's testimony regarding his urinary and fecal incontinence precluding him from being gainfully employed.  In particular, the ALJ referenced Plaintiff's treatment on May 27, 2016, wherein Plaintiff denied wearing pads and reported occasional incontinence.

Although not discussed by the ALJ,[9] the medical record shows Plaintiff's treatment consisted of prescription medications and pelvic floor exercises but no surgery was ever recommended.  In follow-up treatment, Plaintiff reported no incontinence episodes, but he still

---

[8] The undersigned notes that Plaintiff did not ask to use the restroom once during the forty-five minute hearing.  (Tr. 29-52)  Further, Dr. Ho noted during treatment that Plaintiff's voiding diary showed infrequent voids.

[9] The ALJ's failure to discuss all of the available medical record amounts to no more than harmless error in the circumstances of this case and perhaps a deficiency in opinion-writing technique.  See Buckner, 646 F.3d at 560 (arguable deficiency in opinion-writing technique had no bearing on outcome of case and does not require remand).  It appears that this error is "an arguable deficiency in opinion-writing technique" that had no bearing on the outcome."  Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (internal citations omitted).  The outcome of this matter would not change.  See Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the Plaintiff] must provide some indication that the ALJ would have decided differently if the error had not occurred.").

experienced urgency and his medication regimen was working.  During treatment, doctors found

his incontinence to be stable and Plaintiff reported rare urinary and fetal incontinence on his

medication regimen.  Moreover, during treatment with Dr. Kamath, Plaintiff reported that he

only experienced incontinence several times a month.  Although Plaintiff received a prescription

for adult diapers, he reported not wearing pads.  Plaintiff also reported a twenty year history of

chronic urinary and intermittent fecal incontinence thereby evidencing Plaintiff had previously

been able to work with these impairments.  See, e.g., Bullard v. Colvin, 2016 WL 5390950, at *5

(E.D.Mo. Sept. 27, 2016) ("That a claimant works with an impairment for years 'demonstrate[s]

the impairments are not disabling in the present' absent evidence of significant deterioration of

his condition.") (quoting Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005)).  Here, Plaintiff

cites to no evidence, and the Court finds the objective medical record is devoid of any evidence,

that any physician offered any functional limitations due to Plaintiff's incontinence.  No medical

evidence in the record demonstrates that Plaintiff experienced limitations beyond those

determined by the ALJ, and the ALJ properly discounted Plaintiff's subjective complaints of

disabling limitations.[10]  McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011) (court reviews

---

[10] The Social Security Administration issued a ruling that eliminates the use of the term
"credibility" when evaluating a claimant's subjective statements of symptoms, clarifying that
"subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p,
2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017 (republished).  The factors to be
considered in evaluating a claimant's statements, however, remain the same.  See id. at *13
("Our regulations on evaluating symptoms are unchanged.").  See also 20 C.F.R. §§ 404.1529,
416.929.  This new ruling applies to the Commissioner's final decisions made on or after March
28, 2016, as the one in this case.  Because Plaintiff made statements about the limiting effects of
his symptoms, the ALJ determined that his statements were not consistent with the medical and
other evidence of record.  Id. at *8; see also Gonzales v. Barnhart, 465 F.3d890, 895 (8th Cir.
2006) (ALJ may make factual determination that claimant's subjective complaints are not
credible in light of objective medical evidence to the contrary).  As required by Polaski, the ALJ
evaluated Plaintiff's statement of symptoms on the basis of the entire record and articulated
specific reasons in finding that Plaintiff's symptoms were inconsistent with the record.  Because
this determination is supported by good reasons and substantial evidence, the Court defers to it.

record to ensure that ALJ did not disregard evidence or ignore potential limitations).

The ALJ's RFC determination took into account all of Plaintiff's impairments/symptoms, to the extent they were credible and consistent with the objective medical evidence and other evidence.  Although Plaintiff alleges his incontinence would impact his ability to perform work functions, his allegations are not supported by the objective medical evidence.  Plaintiff cites to no objective medical evidence to demonstrate that his incontinence caused any limitations to his work-related activities more serious that the ALJ stated in her RFC assessment.  Indeed, the ALJ specifically stated that she "has taken [Plaintiff's] infrequent incontinence into account in the above residual functional capacity assessment."  (Tr. 19-20)  As previously discussed, the ALJ properly discounted Plaintiff's subjective complaints in his hearing testimony.  After discussing the medical opinion evidence, the ALJ concluded that her RFC assessment was supported by the medical evidence of record considered as a whole. Thus, if all the relevant evidence of record is considered, as the ALJ was obligated to do, the ALJ's RFC is supported by substantial evidence in the record as a whole.    Plaintiff's argument to the contrary is without merit.

Because the ALJ based her RFC assessment upon review of all the credible, relevant evidence of record, and the RFC is supported by some medical evidence, it will not be disturbed. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003).

### B.    Third Party Statements

Plaintiff argues that the ALJ improperly evaluated the third party witness statements. This Court finds that the ALJ properly considered the statements and correctly accorded little weight to them for acceptable reasons.

---

Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016).

### 1. Jarrett McKinney and Rochelle Dixon

The ALJ noted that Jarrett McKinney worked as his father's home health care aide and described the duties he performed for his father. The ALJ also noted that Mr. McKinney's letter did not set forth Plaintiff's functional limitations. The ALJ recognized that Ms. Dixon stated that Plaintiff experiences frequent incontinence.

The ALJ permissibly discounted the statements of Mr. McKinney and Ms. Dixon due to a lack of support in the record. Ostronski v. Chater, 84 F.3d 413, 419 (8th Cir. 1996).[11] As to his functional capacity, Plaintiff reported during medical treatment not having difficulty walking, getting dressed, bathing/grooming, with his memory, and with activities of daily living including cooking, cleaning, shopping, and driving. As to the severity and impact of Plaintiff's incontinence, the objective medical evidence and Plaintiff's voiding diary support the ALJ's view of the evidence. These lay opinions indicate greater functional limitations than Plaintiff had ever reported to or observed by his treating doctors.

Here, it is clear the same evidence that the ALJ relied on to discount Plaintiff's subjective complaints was also used to discredit the third party statements of Plaintiff's capabilities. The ALJ found that the objective medical evidence does not support the extent of limitations set forth in the third party statements.

The Court agrees with the ALJ that Plaintiff's allegations of limitations beyond those accounted for in the RFC are not supported by the record. The same evidence that the ALJ referred to in discrediting Plaintiff's claims also discredits these third party statements of

---

[11] The undersigned notes that neither of the two of the third-party witnesses, Ms. Dixon and Mr. McKinney, was medically trained, and therefore did not have the expertise to make clinical determinations. Moreover, these witnesses are a family member and a friend, and had motivation to help Plaintiff obtain his benefits. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("Corroborating testimony of an individual living with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case.").

Plaintiff's capabilities and limitations.  See, e.g. Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (affirming the ALJ because "it is evident that most of [the third party's] testimony concerning [the claimant's] capabilities was discredited by the same evidence that discredits [the claimant's] own testimony concerning his limitations).  Thus, the ALJ did not commit reversible error in giving their opinions little weight to the third-party statements of Mr. McKinney and Ms. Dixon.  While the ALJ was required to consider such third-party statements, she was not required to believe or fully credit them.  See SSR 96-7.

### 2. Rosella McKinney and Kimberly Byrd

Plaintiff also asserts that the RFC is undermined by the ALJ's failure to address two third party statements, a function report from Rosella McKinney and the Function Report – Adult completed on behalf of Plaintiff by Kimberly Byrd.

Ms. McKinney indicated that Plaintiff has problems with bowel movements and stays in the bathroom for long periods of time.  Ms. Byrd indicated that Plaintiff uses the bathroom with great frequency and has frequent accidents.  Ms. Byrd also indicated that Plaintiff has problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, understanding, concentrating, following directions, completing tasks, and getting along with others.  Plaintiff contends that the RFC is undermined by the ALJ's failure to address these third party statements.

To assist in formulating the RFC, an ALJ is obligated to consider third party statements regarding a plaintiff's functional limitations.  Robertson v. Colvin, 2014 WL 106117, at *4 (W.D.Mo. Jan. 10, 2014) (citing 20 C.F.R. §§ 404.1529(c)(1)-(30, 404.1545(a)(3); SSR 85-16; SSR 96-7p; SSR 96-8p)).  An ALJ's failure to acknowledge a third party statement is at minimum, a procedural error.  Id.  Whether this error is prejudicial or merely represents a

deficiency in opinion-writing technique depends on a variety of considerations, including whether other district court errors also support remand; and whether the record evidence also discredits the unacknowledged third party statement.  Id.

The ALJ did not discuss the statements of Ms. Byrd or Ms. McKinney.  Defendant acknowledges that the ALJ did not address these statements but argues this error was harmless in light of the lack of supporting objective evidence failing to support more than infrequent incontinence as evidenced by Plaintiff's failure to use adult diapers or pads.  See Buckner, 646 F.3d at 559-60 (concluding ALJ did not err by failing to address a third party's statement where the same evidence that the ALJ referred to in discrediting plaintiff's claims also discredits the third party statements).  The lack of supporting objective evidence is a factor, although not one to be relied on solely, that may be properly considered.  Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008).  For instance, Plaintiff complained of back pain, but consistently had a steady gait and normal strength.  Diagnostic tests revealed only mild degenerative changes, some disk protrusion, and nerve root displacement.  The ALJ also noted the conservative and limited psychiatric treatment consisting "of very brief office appointments at the Hopewell Center for medication management and his depressive disorder has remained stable."  (Tr. 20)  Further, the ALJ noted that the psychiatric review technique form completed by a state agency psychologist, Terry Dunn, in which he finds that Plaintiff to have no severe mental impairment. Also, there are inconsistencies in the record, e.g. sometimes Plaintiff complained of low back pain but then other times, Plaintiff reported relief from his medication regimen.  See Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000) ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in evidence as a whole.").  Although Plaintiff testified at the hearing that he cannot drive, the emergency room treatment notes indicate that "Plaintiff arrived via

private auto accompanied by self from home." (Tr. 554, 688)

Preferably an ALJ should provide specific reasons for the weight given each witness' testimony, however, this method is not required of an ALJ. Robinson v. Sullivan, 956 F.2d 836 (8th Cir. 1992) (upholding an ALJ's denial of benefits where it was evident the ALJ determined third party witness testimony was not credible with the same evidence that discredited claimant's testimony). The Court agrees with the ALJ that Plaintiff's allegations of limitations beyond those accounted for in the RFC are not credible. The same evidence that the ALJ referred to in discrediting Plaintiff's claims also discredits these third party statements of Plaintiff's capabilities and limitations. Thus, to the extent that Plaintiff relies on the third party statements by Ms. Byrd and Ms. McKinney to support a greater degree of limitation, the ALJ did not commit reversible error in failing to specifically address them.

## VIII.  Conclusion

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole. See Finch, 547 F.3d at 935. Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case. See Buckner, 646 F.3d at 556. For the reasons set forth above, the Commissioner's decision denying benefits is affirmed. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of March, 2019.